WATERS-PIERCE OIL COMPANY *v.* BURROWS.

Opinion delivered November 11, 1905.

1. JURY—CHALLENGES.—Under Kirby's Digest § § 4536, 4540, providing that each party to a civil suit "shall have three peremptory challenges," and that "where there are several persons on the same side, the challenge of one shall be the challenge of all," *held* that where several joint tort feasors are joined as defendants in the same suit,

they are not entitled in the aggregate to more than three peremptory challenges. (Page 85.)

2. EVIDENCE—UNDISPUTED FACT.—It was not error to permit an employee of defendant oil company to testify as to an agreement of that company with a gas company to deliver gasoline into the latter's tanks, for the purpose of showing that gasoline was dangerous and required careful handling, if such was an undisputed fact. (Page 86.)

3. SAME—PREJUDICE.—Testimony as to a conversation between a witness and another, though inadmissible, was not prejudicial if the facts which it tended to prove were otherwise established by competent evidence. (Page 86.)

4. TRIAL—REFUSAL TO DIRECT VERDICT.—It was not error, in an action against an oil company for damages growing out of a gasoline explosion, to refuse to instruct the jury to find for defendant if there was evidence that the explosion was caused by the negligence of an employee of defendant. (Page 87.)

Appeal from Garland Circuit Court; A. M. DUFFIE, Judge; affirmed.

### STATEMENT BY THE COURT.

This action was brought in the Garland Circuit Court by J. C. Burrows against Waters-Pierce Oil Co., Arkansas Gas Co., Chambers & Walker, Sam Mayer, and Leo Mayer, to recover damages for personal injuries caused by an explosion of gasoline vapor, which occured on the 24th day of December, 1902, in a building at Hot Springs known as the Turf Exchange, while gasoline was being delivered by an employee of the Waters-Pierce Oil Company in a storage tank connected with a gas generating machine on the premises of the Turf Exchange. Plaintiff alleged in his complaint that the defendants, "acting together and in concert through their agents, servants and employees, then and there unlawfully, carelessly and negligently proceeded to transfer the gasoline from the vessel in which it was carried" to the lot on which the Turf Exchange is situated, "and in so transferring the gasoline the defendants unlawfully, negligently and carelessly allowed the gasoline to escape and run out and under the floor of the building on the lot, and unlawfully and negligently and carelessly allowed the gasoline to explode and wreck the building and inflict great and serious injuries upon the plaintiff," he being in the building at the

time.    For the damages sustained by him he asked for judgment in the sum of $10,000.

The defendant, Waters-Pierce Oil Co., answered and denied specifically each allegation of the complaint as to its negligence, or that of its agents or employees.

The action was dismissed as to Sam and Leo Mayer, and the jury returned a verdict in favor of the Arkansas Gas Company, and Chambers & Walker, and in favor of the plaintiff against the defendant Waters-Pierce Oil Company, and assessed his damages at $1,100.

The evidence adduced at the trial in the case tended to prove the following among other facts:

The defendants Chambers & Walker "were lessees of a two-story building in Hot Springs, in this State, known as the Turf Exchange, in which they conducted a saloon and gambling rooms. The first floor was a large single room, which opened on Central Avenue, and extended back westwardly the entire length of the building to an open area extending back to Exchange street. There was a bar in the front of this room on Central Avenue, and in the portion back of the bar, separated by a low partition, Sam and Leo Mayer, as co-partners and sub-lessees of Chambers & Walker, conducted a poolroom, in which they sold pools, or accepted wagers on horse races."

A short time before the 24th of December, 1902, "Chambers & Walker entered into a contract with the defendant, Arkansas Gas Company, to place on the Turf Exchange premises an automatic gas machine plant for supplying vapor illuminating gas * * in the entire Turf Exchange Building." This was done, and the machine "was accepted and put in operation by Chambers & Walker four or five days before the explosion occurred."

In the rear, and a few inches lower than the first floor of the Turf Exchange, was an open area or yard, which was of the same width as the building, and extended back about sixteen feet to a stone retaining wall twelve or thirteen inches thick located on the line of Exchange street, on which the rear of the premises abutted. The top of this retaining wall was eight or nine feet above the area, and on a level with the adjoining side-

walk, and had on it a board fence six or seven feet high, with a door opening from the street to a platform and stairway leading down into the area.

The area was paved with granitoid, except inside of a coal shed located at the southwest corner of the area. This shed was about ten feet by six feet square, and its west wall was a part of the stone retaining wall and of the board fence on top of the latter.

At the time the gas machine plant was placed on the premises, there was near the rear wall of the Exchange Building, at the northeast corner of the area, a drain opening, with a grated cover, for draining the area; there were also two narrow horizontal ventilator openings, one on either side of the rear door, through the wall, two or three inches above the floor of the area, which opened into the space over the poolroom. On the south side of the area there was a wall of a building, partly bricks and partly boards, and on the north side was a high board fence.

The gas machine plant consisted of an engine, generator, etc., a galvanized iron storage tank for holding a supply of gasoline, with pipes (two) connecting the engine and tank, and also a line of pipe connecting the storage tank with an iron receiving box in the sidewalk on Exchange street outside of the retaining wall.

The engine and generator were placed in a small house, covered with sheet iron, and located in the southeast corner of the area next to the rear wall of the Turf Exchange Building and the wall of the building adjoining on the south. This little engine house was raised on blocks two or three inches above the granitoid paving, so as to leave a clear space underneath, and there was a space of three feet three inches between it and the east wall of the coal shed. That (the east) wall of the coal shed was double. The outside boards of the same were nailed into the frame of the shed, horizontally, close together, the lower board resting on the granitoid pavement, and a tier of open board shelves were hung on the outside wall, and extended over towards the opposite wall of the little engine house. On these shelves were laid a lot of empty glass bottles.

The galvanized iron storage tank was cylindrical in form, 6 feet 6 inches long, and 18 inches in diameter, and would hold 67 gallons of gasoline. It was placed horizontally between the engine house and the coal shed, by cutting through the granitoiding of the area and excavating sufficient soil to permit of its being laid about one-half of its diameter below the surface. After it was laid in the trench, the tank was covered with two layers of brick laid on edge in cement plaster, and the whole was plastered over with a thick layer of cement, in such a way as to form a smooth arched mound, 7 to 7½ feet long and rising about twelve inches above the level of the area floor, which practically filled up the space between the engine house and the coal shed, with a slope towards each.

The tank was connected with the generating machine proper by two small iron pipes, through one of which the machine automatically drew from the tank its supply of gasoline, and through the other discharged back into the tank any surplus of fluid. Neither these connecting pipes nor the engine was involved in any way in the explosion, but still a knowledge of their location, etc., is essential to a proper understanding of how the explosion occurred.

There was also attached to the top of the tank, near its south end as it lay embedded in the area, an upright iron pipe 10 or 12 inches long and 1½ inches in diameter, which is called in the testimony the "T" pipe or the upright "T pipe." The upper end of this pipe had threads cut in it, and was fitted with an iron cap which could readily be screwed off or on the pipe. Inside the tank was a "float" with an upright wooden stick less than an inch in diameter, which extended up through the upright "T" pipe for the purpose of indicating the quantity of gasoline there was in the tank while the latter was being filled, etc. With the cap of the upright pipe off, the end of this stick would rise up out of the pipe as the gasoline was filled into the tank. When the tank was full, the stick would stand about six or eight inches out of the pipe, and when empty the end of the stick would be flush with the end of the pipe. This pipe was to be kept closed except when the tank was being filled or it was desirable to know how much gasoline was in the tank.

The line of pipe connecting the storage tank with the receiving box was arranged as follows: The end of a line of pipe, of the same inside diameter as the upright T pipe on the storage tank, was attached at right angles to the latter pipe where it joined the top of the tank, and extended thence, horizontally and obliquely with the tank, from three to three and one-half feet to very near the outside east wall of the coal shed; thence up vertically through the tier of shelves six feet three inches; thence at right angles with the tank, through the east wall of the coal shed and the stone retaining wall, to a point about 12 to 15 inches outside the latter wall and twelve inches below the surface of the sidewalk on Exchange street; thence vertically about six inches to the bottom of a cast iron box, designated in the testimony as a "receiving box," and having a one and one-half inch opening through the bottom to which the end of the six-inch vertical pipe was attached.

The receiving box was about six inches long, five inches wide and six inches deep, with a hinged lid, and lock for locking the same when the box was not being used. It also had, extending up from the bottom some two or three inches, an open nipple or pipe, with thread on it for receiving a cap. This open nipple was a continuation of the opening in the end of the pipe attached to the bottom of the box. The box had also another open nipple extending through its bottom, but it was not utilized in any way in connection with this particular apparatus, and was filled underneath with the soil which the bottom of the box rested on. The box was sunk in the sidewalk a few inches outside the stone retaining wall, and bricks were laid around it, and covered with cement in a way to leave about one inch of the box projecting above the bricks and the surface of the sidewalk. The sidewalk was not otherwise paved, but was reasonably solid and even.

The line of 1½-inch pipe, and the receiving box, at the Turf Exchange were placed in the manner mentioned, so that the storage tank could be filled from time to time with gasoline, by passing the gasoline through the pipe opening, in the receiving box on the sidewalk, and permitting it to run, by gravitation, through the line of pipe into the storage tank in the area.

The Waters-Pierce Oil Company is a wholesale dealer in petroleum oils, etc., and keeps a stock of oils, including gasoline; also an agent at Hot Springs, Ark., and at other towns and cities in the State. Four or five days before the explosion in question the Waters-Pierce Oil Company's agent at Hot Springs, in pursuance of an order received over the telephone that day, sent an iron barrel of what is known commercially as 88 degree gasoline to the Turf Exchange in charge of Ben Murray, the company's driver, for use in the gas plant. At that time the storage tank was sunk in the ground area, and had the upright T pipe attached in position, but the tank was not bricked and cemented over, nor was the line of pipe extending up and out to the receiving box on the sidewalk in position or connected with the upright T pipe. When Murray reached the rear of the Turf Exchange on Exchange street with the barrel of gasoline, he found the superintendent of the Arkansas Gas Company, Humphrey by name, directing the work then in progress on the gas plant, and Murray unloaded the barrel of gasoline, and placed it on end on the platform at the top of the flight of steps leading into the area. Murray had with him a hose having an iron "goose neck" nozzle at one end, used for siphoning oils and gasoline from one receptacle to another, and proceeded to siphon the gasoline from the barrel into the tank, immediately through the upright T pipe on the tank. The inside diameter of the hose was one inch, and of the nozzle three-fourths of an inch. Murray at that time was standing in the area at the tank, and when the gasoline started to flow through the hose, for some reason a small portion of it was spilled or escaped through the opening on the side near the base of the upright T pipe, in which the end of the line of the pipe leading to the receiving box was intended to be inserted. Murray says that it escaped there, while Humphrey says that it splattered out of the goose neck when Murray quit sucking and put his hand over the end of the "goose neck." Whatever the cause may have been, Murray, at Humphrey's direction, quit siphoning the gasoline, and left the barrel of gasoline standing on the platform.

Some time later the receiving box was placed in position in the sidewalk, and connected with the tank by means of the

line of pipe, in the manner heretofore explained. And, according to the testimony of Humphrey, the barrel of gasoline was emptied into the storage tank by placing the barrel on its side near the receiving box, inserting a three-fourths inch spigot in the end of the barrel immediately over the funnel inserted in the pipe opening in the receiving box, opening the spigot and permitting the oil to run into the funnel.

When that barrel of gasoline was transferred to the storage tank, the gas machine was started, and the entire Turf Exchange premises were illuminated with the gas generated from it.

The explosion in question here occurred while the next barrel of gasoline was being delivered into the storage tank; and the facts and circumstances leading up to it were these:

On December 24, 1902, four or five days after the first barrel of gasoline was delivered at the Turf Exchange, the Waters-Pierce Oil Company's agent at Hot Springs, received over the telephone an order to deliver at the Turf Exchange another barrel of gasoline, with directions for the driver to go to the porter at the Turf Exchange for the key to the receiving box. Thereupon, an iron barrel containing 53 gallons of 88 degree gasoline was loaded on a platform wagon and driven by Murray, the same driver who delivered the other barrel, to the Turf Exchange premises on Exchange street. Murray arrived at the rear of the premises about 4 o' clock p. m., left his team, and went into the poolroom to look for the porter. Murray there saw a negro with a uniform cap on, which indicated that he was a porter about the place. It afterwards developed that the porter's name was Arthur Harris. Murray said to him that he had a barrel of gasoline for the place. The porter replied in substance, "All right. We have got it fixed all right now." The porter testified that he got the key, and then went with Murray, and unlocked the receiving box. On the other hand, Murray testified that they went out on the sidewalk first, found the receiving box closed, and the porter then said, "I will go and get the key." Murray discovered he had no wrench with him to take the iron cap off of the bung in the head of the barrel, and went to a neighboring store to procure one, while the porter went for the key. When Murray returned with the wrench, he found the porter at the receiving box, and the end of the receiving pipe in it open.

Murray asked the porter for a funnel, and the porter said they did not have one. Murray then made a funnel with a piece of manila wrapping paper, and placed it in the receiving pipe of the box, took the cap off the bunghole in the iron barrel, inserted one end of the same hose in the barrel, and by sucking at the end of the goose neck started the gasoline to flowing into the funnel. The barrel was at the time standing upright on the wagon about six feet from and about three or four feet above the receiving box, and part of the hose between the barrel and the goose neck laid on the ground. Murray testified that the porter was holding the funnel when the gasoline started to flow into it, but could not remember how long he held it; that he could not remember how long the porter stayed at the box before going down to the area, but thinks it was five or eight minutes, nor whether the porter went down of his own accord or at Murray's suggestion; that "perhaps" half of the gasoline had run into the receiving box when the porter left him, and went down into the area, and that the porter "hollered right after he got down there."

"On the other hand, the porter testified that, as soon as Murray got ready to start the gasoline to flow from the siphon, he left Murray, and went down to the storage tank, unscrewed the cap from the end of the upright T pipe, and sat down astraddle of the mound over the tank, facing the pipe, to watch the indicator stick, which at that time protruded out of the end of the pipe.

"It appears that Humphrey, the manager of the Arkansas Gas Company, had, with the concurrence of Chambers & Walker's representative, selected the porter to see to the filling of the tank, and told him that he, Humphrey, would order another barrel of gasoline to be put in the tank that day. Humphrey also told the porter to watch the indicator stick when the tank was being filled, and when it rose to a certain height, indicating that the tank was nearly full, to stop the filling. This precaution was necessary, as the person at the receiving box on the sidewalk directing the flow of gasoline into the box could not, because of the intervening fence and coal shed, see the mound of the tank and the upright T pipe in the area below.

"The porter, Arthur Harris, also testified that after he sat down on the tank—he did not know how long—a man named Guy Woolstan came out of the poolroom into the area, and called his attention to a stream of gasoline running over the granitoid paving from under the front, or north, side of the little engine house, diagonally and near the foot of the stairs toward the rear wall of the Turf Exchange Building and the drain opening in the northeast corner of the area. The stream reached to the drain opening. The porter at once called to Murray to 'Hold! stop!' got up from where he was sitting on the mound, and walked over to the steps leading down from the sidewalk.

"Guy Woolstan testified that about 4 o'clock in the afternoon of December 24, 1902, as he passed out of the back door of the poolroom into the area, he saw a stream of gasoline, seven or eight inches wide, running over the pavement of the area from under the door of the little engine house over to the drain opening in the northeast corner of the area. He did not see gasoline anywhere else. The porter, Arthur Harris, was at this time sitting on the mound over the tank, with his back towards Woolstan. Woolstan at once said, "This is gasoline." The porter immediately cried, "Hold on!" or something like that, and Murray came down the steps into the area from the sidewalk. Woolstan remained in the area but a moment; walked quickly through the crowd in the poolroom, about 80 feet, to a point near the partition between the poolroom and the bar, when the explosion occurred. He did not notice the upright T pipe while he was in the area.

"Murray testified that, as soon as he heard the porter call, 'Hold! stop!' he stopped the flow of gasoline into the receiving box, hung the siphon hose on the wagon, and went down the steps to the area. He saw the gasoline running over the granitoid pavement from under the little engine house, as mentioned by Harris and Woolstan. Murray started to find where the gasoline was escaping from, and to close the door and windows opening from the poolroom, when the explosion occurred. This was all the testimony in this feature of the case.

"The center or main force of the explosion was under the floor of the poolroom. Appellee was in the room at the time, and was, with a number of others, injured."

Other facts will be noticed in the opinion.

*Mehaffy & Armistead,* and *John D. Johnson,* for appellant.

Where the defendants have antagonistic interests, they are severally entitled to the peremptory challenges allowed by the statute to "each party." Kirby's Digest, § 4536; 68 N. W. Rep. 141; 6 Ohio, 186; 10 *Ib.* 133; 29 Kan. 688; Enc. P. & P. vol. 12, 429; *Ib.* vol. 15, 464; 37 Mich. 490; 40 Wis. 28; 74 Ark. 212.

The admission of E. R. Russell's testimony was prejudicial, in that it did not tend to prove the issue, and did not constitute a link in chain of proof. 1 Greenleaf on Evidence (15 Ed.), § § 51, 52. The testimony of Hippolite in relation to an agreement between appellant and the Arkansas Gas Company, whereby the former was to deliver gasoline into the tanks of the latter wherever located in the State, tended to draw the minds of the jury away from the issues as to whether appellant's driver had discharged the gasoline with due care into the tank, and to confuse and mislead them as to what acts on his part constituted negligence for which appellant was liable to plaintiff. 1 Greenleaf, *supra,* § 52; 82 Am. Dec. 228. The testimony of witness Humphreys was inadmissible. "Proof of specific acts of negligence on the part of a defendant does not tend to prove negligence on the particular occasion which is the subject of inquiry. 17 Am. Rep. 325; 58 Ark. 125.

It was error to refuse instruction No. 1 asked by appellant. The evidence failed to show that the explosion was occasioned by appellant or its agent Murray. *Chambers* v. *Van Elderen,* U. S. Cir. Ct. App. 137 Fed. 557; Shear. & Red. on Neg. § 9; Whittaker's Smith on Neg. 419; 93 Wis. 470; 33 L. R. A. 65; 31 L. R. A. 583; 31 Pa. 510; 29 N. Y. 383; 11 W. Va. 14; 90 Ind. 205.

*Wood & Henderson,* for appellee.

Reviewing the evidence, we hold that the testimony of Russell was admissible as tending to throw light on the question as to the proper method of transferring the gasoline into the tank; that the testimony of Hippolite as to the arrangement between appellant and the Gas Company was proper, being a circumstance to be considered by the jury in determining to what extent appellant was required to examine the appliances to be used by it in filling the tanks, such arrangement forming a part of the knowledge possessed by the Oil Company when it received the

order and started its employee with the barrel of gasoline, and a circumstance to be considered in determining the question as to the Oil Company's negligence. And that Humphrey's testimony was admissible, not for the purpose of proving a previous act of negligence, but to show that Murray, appellant's driver, was then instructed in the manner of filling the tank, and the character of appliances to be used for that purpose.

The words "each party," used in the statute, include all parties on each side in a suit, meaning that each side; whether composed of one or more persons, may challenge three jurors. 74 S. W. 289; 27 Ky. 267; 93 Mass. 568; 24 N. W. 429; 76 N. C. 360; 10 Ohio Dec. 665; 44 Tenn. 227; 3 Ala. 88; 17 Pac. 746; 15 Ind. 274; 18 S. W. 695; 47 N. H. 466; 83 Ill. 405; 4 Ohio Cir. Ct. Rep. 500. In any event, in the absence of showing that some juror was retained whom the appellant desired to challenge, the court will not hold that it was prejudicial by the refusal to allow it three separate peremptory challenges. 72 S. W. 1041; 66 S. W. 698; 74 Ark. 212.

There being evidence tending to show that Murray, appellant's employee, was negligent in discharging the gasoline into the tank, appellant's instruction No. 1 was properly refused.

BATTLE, J., (after stating the facts.) In the impaneling of the jury in the case the trial court refused to allow the Waters-Pierce Oil Company to peremptorily challenge three jurors. The appellant insists that the court erred. But we do not think so. The statutes expressly provide in civil cases that "each party shall have three peremptory challenges;" and that where there are several persons on the same side, the challenge of one shall be the challenge of all. All the defendants are not entitled in the aggregate to more than three peremptory challenges. The statutes do not provide that they shall, in any case, be entitled to more. Kirby's Digest, § § 4534-4540.

During the progress of the trial the following questions were asked E. R. Russell, a witness, and answered by him, over the objections of the Waters-Pierce Oil Company: "Why did you (Oil Company) get that rotary pump?" He answered, "The one we (Oil Company) had there would not do." He was then asked: "Had you and him (Humphrey, employee of Arkansas Gas Company) had any conversation about getting a rotary pump

for the purpose of delivering this oil into this tank?" He answered: "He asked me if I had anything to empty this barrel with." Plaintiff asked him: "State whether or not it is true that you got that pump for the purpose of delivering gasoline into this tank put in by Humphrey?" And he answered: "I don't remember now whether we got it for that purpose or not." There is no reason given in the answer to these questions for purchasing the rotary pump, except the one the Oil Company had would not do, and no opinion as to the relative merits of the siphon and the rotary pump was expressed. We do not think that the testimony was prejudicial.

A witness was allowed to testify over the objections of the Oil Company as to an agreement of that Company with the Arkansas Gas Company to deliver gasoline into the tanks of the latter wherever its plants were used in this State, and wherever the former had an agent. This was for the purpose of showing that gasoline was dangerous, and required careful handling. This was an undisputed fact, and the testimony was not prejudicial.

The appellant says:

"The court also erred in permitting counsel to ask John Humphrey about filling the tank on Saturday evening before, and to ask him what occurred there. He was asked: 'Was Murray there?' and answered: 'Yes.' He was also asked: 'Did you undertake to empty that or put it into the tank?' and he answered: 'Yes.' He was then asked: 'How?' The court also permitted the plaintiff to ask this witness, and the latter to answer, questions as to the situation and condition of the tank and connections on the Saturday evening before the explosion, and where Murray was, and what he did. Witness, in answer to question, said: 'He (meaning Murray) came down and took the pipe out of my hands and undertook to siphon it.' And he was asked: 'What were you doing with the hose?' and he answered: 'I just had my hands on the hose. Had the gooseneck stuck in that opening there, and he came down and grabbed hold of it, and as soon as I saw what he started to do I grabbed it away. Meanwhile I hallooed to the man above, and he had pulled the hose out of the tank.' He was then asked: 'Did you say anything about the manner of filling that tank at that time, and how it should be filled; state to the jury?' The witness

answered: 'When he undertook to siphon it after taking the nozzle out of the opening away from me, I saw what he was doing, I grabbed it away from him, and I got very angry about it, because I thought he knew better. I told him never to undertake to siphon gasoline out of one of those barrels into the storage tank. I told him he couldn't control the flow; that he had his tank upon a high elevation, and it wasn't safe to do it. I told him to do it no more. I told him it wasn't safe at all; that he could not control the flow was the main thing. I knew that we could put it in there by the use of a rotary pump, and thought they were using it. I gave Murray instructions to use the rotary pump. Counsel then asked: 'State what you said?' and the witness answered: 'I thought he was using it; that's how I come to tell him not to try and siphon it when he took it from me.' He said: 'The pump won't work.' I said: 'Then we will not put any in there, but we will let the barrel stay on the sidewalk and let it remain there until Monday morning.' I said: 'We won't fill it by siphon,' and for him never to undertake to fill the tank that way because it wasn't safe, because he couldn't control the flow of gasoline. He was then asked: 'Did you tell him how to fill it?' and the witness answered: 'With the rotary pump always, because he could control it; that the slower he pumped, the slower it would flow.' Counsel asked: 'Did you tell him to use anything else?' The witness answered: 'A metal funnel.' This witness was asked: 'Didn't you mean by that that this was the only place by which it could get out if it went in at that pipe? To which he answered: 'Yes.' " This testimony was inadmissible. But the effect of it was to show that the witness was of the opinion that the rotary pump was safer than the siphon, because the flow of the gasoline in the former could be controlled, and it could not be in the latter, and for this reason the former should be used. This was the only objection he urged against the use of the siphon. He testified to the same effect, and that he had tested the siphon, and found it impracticable. This was competent. We think the incompetent testimony was not prejudicial.

Appellant complains because the court refused to instruct the jury to return a verdict in its favor. The court instructed the jury as follows:

"The mere fact of an explosion, and that plaintiff was injured thereby, is not sufficient to warant a verdict against the Waters-Pierce Oil Company. Before you can find a verdict against it, you may also find by a fair preponderance of the evidence that Murray was guilty of negligence in the manner in which he delivered the gasoline into the pipe in the receiving box, and that his negligence in so delivering it, without the intervention of any other independent agency, caused or contributed to the injury; and unless the plaintiff has established by a fair preponderance of the evidence each of these facts, your verdict must be for the defendant, Waters-Pierce Oil Company.

"Even if you should believe from the evidence that Murray was guilty of negligence in the manner in which he delivered the gasoline into the pipe in the receiving box on Exchange street, still, you could not find against the defendant, Waters-Pierce Oil Company, unless you could further find by a fair preponderance of the evidence that the gasoline, escaping because of his negligence, got down into the area and caused the explosion; and if the plaintiff has failed to establish either of these facts by a fair preponderance of the evidence, your verdict must be for the defendant, Waters-Pierce Oil Company."

"The jury are also instructed that if they believe and find from the evidence that either the defendant the Arkansas Gas Company, or the defendants Chambers & Walker, employed witness Harris to watch the open, upright pipe attached to the tank in question while gasoline was being poured into said tank through the receiving box and pipe by the witness Murray, and to observe whether the gasoline flowed out of said upright pipe; that as a matter of fact the gasoline which caused the explosion and resulted in injury to plaintiff did flow out of said upright pipe, without the knowledge of said Murray, while gasoline was being passed into said receiving box and pipe by the said Murray on the 24th day of December, 1902, and the said Harris negligently failed to observe the same, or, if he observed the same, failed to notify the said Murray in time to enable him to stop the flow of gasoline into said receiving box and pipe, and thereby prevent said overflow and resulting explosion, then the said Murray was not guilty of negligence, and you should find a verdict for the Waters-Pierce Oil Company."

Before the jury could have returned a verdict in favor of appellee, J. C. Burrows, against the appellant, Waters-Pierce Oil Company, according to these instructions, it was necessary for them to find that the stream of gasoline that ran over the granitoid pavement through the engine room on the premises leased by Chambers & Walker, known as the Turf Exchange, was caused by Murray transferring gasoline into the pipe in the receiving tank in a negligent and careless manner. They obviously so found, and there was evidence sufficient to sustain their verdict in this court. They so found under instructions given at the request of appellant, and it cannot legally complain in this court of the court's refusal to instruct the jury to return a verdict in its favor.

Numerous instructions were given to the jury, and exceptions to many of them were saved.

Instructions were asked by appellant and refused by the court. Construed as a whole, as they should be, we find no reversible error in those given. The instructions refused, so far as they are correct and were applicable, were included in instructions that were given.

Judgment affirmed.